**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kurt Rebensdorf, ) | No. CV-08-1529-PHX-SRB |
| ) | |
| Plaintiff, ) | **ORDER** |
| ) | |
| vs. ) | |
| ) | |
| Michael J. Astrue, Commissioner of Social ) Security, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

Plaintiff Kurt Rebensdorf applied for, and was denied, disability insurance benefits and supplemental SSI disability benefits under the Social Security Act (the "Act"). Plaintiff then filed a complaint with this Court seeking judicial review of that denial. The Court now considers Plaintiff's Opening Brief and Defendant's Opposition to Plaintiff's Opening Brief.

**I.    BACKGROUND**

On July 18, 2004, Plaintiff filed an application for a period of disability and disability insurance benefits, alleging disability beginning December 1, 2002. (Administrative Record ("AR") at 12.) Plaintiff also protectively filed a Title XVI application for SSI benefits on the same date. (AR at 12.) Plaintiff later amended the onset date to May 3, 2003. (AR at 12.) Plaintiff was born on October 26, 1978 and was 24 years old on the alleged disability date. (AR at 17.) Plaintiff's applications were denied initially and on reconsideration, and Plaintiff appeared and testified before Michael J. Cianci, Jr., an Administrative Law Judge ("ALJ"),

on December 11, 2006. (AR at 12, 526-45.) The ALJ's decision, dated January 23, 2007, concluded that Plaintiff had the residual functional capacity ("RFC") to perform medium work, but must avoid all workplace hazards, can only perform low stress work with no high production quotas, and requires minimal interaction with the public. (AR at 16-17.) The ALJ concluded that Plaintiff is unable to perform any past relevant work. (AR at 17.) The ALJ found that considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that he can perform. (AR at 18-19.) The ALJ concluded that Plaintiff was not under a "disability" as defined in the Act from the alleged onset date through the date of the decision. (AR at 19.) Following a denial of Plaintiff's request for review by the Social Security Administration's Appeals Council on June 3, 2008, Plaintiff filed this action for judicial review. (AR at 3-5.)

**A. Medical Evidence**

**1. Treating Sources**

Robert P. Cowan, M.D., a neurologist, examined Plaintiff on May 30, 2004. (AR at 364-66.) He noted that by history Plaintiff had either complex partial seizures or temporal lobe epilepsy. (AR at 365.) Plaintiff reported that he had been having seizures for three years, two to three times per week. (AR at 366.) Dr. Cowan noted that Plaintiff was taking 300 mg of Dilantin to treat his seizures, and planned to adjust his medication following lab work and an EEG. (AR at 365.) On September 20, 2004, Dr. Cowan indicated that Plaintiff had a seizure on September 3, 2004, was treated in the hospital, and had experienced three to four mild seizures since then. (AR at 363.) On October 27, 2004, Plaintiff was treated by Nathan M. Tritle, M.D. for a left ear canal fracture from a fall caused by a seizure when he fell off of his porch. (AR at 370.) Plaintiff presented himself intoxicated to the emergency room. (AR at 488.) Plaintiff reported that he had seizures every four to eight weeks. (AR at 370.) In February 2005, Plaintiff reported having seizures and experiencing hallucinations and decreased memory, and requested a new neurologist. (AR at 241.) On March 25, 2005, Plaintiff reported that he had had a seizure two days before. (AR at 237.)

1    Panna Shah, M.D. started treating Plaintiff in March 2005. (AR at 474-75.) Dr. Shah
2 noted that Plaintiff was discharged from Winslow Hospital on February 28, 2005. (AR at
3 474.)  Dr. Shah stated that there is a possibility of pseudoseizure and noted a behavioral
4 component to the seizures. (AR at 475.) Dr. Shah ordered an MRI and EEG. (AR at 475.)
5 Dr. Shah reported that Plaintiff had stopped taking Dilantin and was taking 3000 mg of
6 Depakote per day. (AR at 474.) On July 27, 2005, Dr. Shah's treatment notes show that
7 Plaintiff had had fewer seizures since Lamictal was added, and was taking 500 mg of
8 Depakote in the morning and 1500 mg to stay asleep. (AR at 471.) On September 28, 2005,
9 Dr. Shah noted that Plaintiff was continuing with Depakote and taking 100 mg of Lamictal
10 twice per day.  (AR at 470.)  Dr. Shah stated that Plaintiff's seizures were "fairly under
11 control" and Plaintiff appeared "neurologically stable." (AR at 470.) On March 6, 2006, Dr.
12 Shah noted a recent emergency room visit to Winslow Memorial Hospital and reduced
13 Plaintiff's Depakote to 1000 mg in the morning and 1000mg at night due to significantly high
14 levels found in his system. (AR at 466, 468.)

15    Dr. Shah's treatment notes on April 3, 2006 discuss recent MRI results showing
16 poorly controlled breakthrough seizures. (AR at 467.) On April 3, 2006 Plaintiff reported
17 that he drinks only two beers a night and was experiencing stress with his roommate. (AR
18 at 466.) Plaintiff also reported that he had bad dreams and bit his mouth. (AR at 466.) Dr.
19 Shah discussed with Plaintiff the fact that some of his seizures were real and coming from
20 his brain and some were pseudoseizures that may be coming from stress. (AR at 466.) Dr.
21 Shah increased the Lamictal to 200 mg in the morning and 150 mg at night, gradually
22 increasing to 200 mg twice per day. (AR at 466.) On May 1, 2006, Plaintiff reported that
23 since Lamictal was added, the number of seizures had gone down significantly. (AR at 465.)
24 Plaintiff reported that he had had a mild seizure two days before and that he had a few 30-40
25 second partial complex seizures. (AR at 465.)

26    On June 12, 2006, Plaintiff reported that Ativan was helping him "a lot" and that he
27 was "very pleased with the current control of seizures." (AR at 464.) On September 26,
28 2006, Plaintiff reported that he had had a seizure and hit his head at the coffee table. (AR

- 3 -

1  at 463.) Plaintiff told Dr. Shah that he believed some of his seizures might be stress related.
2  (AR at 463.) Plaintiff was taking 1000 mg Depakote and 25 mg Lamictal. (AR at 463.) Dr.
3  Shah noted that Plaintiff's seizures were poorly controlled and added 500 mg of Keppra daily
4  for one week, increasing to 750 mg. (AR at 463.)

5       In May 2004, Plaintiff underwent a psychiatric evaluation and was diagnosed with
6  adjustment disorder with mixed anxiety and depressed mood. (AR at 343-55.) A Global
7  Assessment of Functioning ("GAF") score of 68 was assessed, indicating mild symptoms.
8  (AR at 353.) In July 2004, John C. Woods, M.D. assessed a GAF score of 50, indicating
9  more serious symptoms. (AR at 342.) Psychiatric follow-up treatment notes from November
10 2004 discuss Plaintiff's history of alcoholism and marijuana addiction. (AR at 327.)

11      On May 31, 2005, David Friend, an outpatient therapist, wrote a letter to the state
12 agency. (AR at 229.) Mr. Friend reported that Plaintiff had mild to moderate depression
13 subsequent to alcoholism and seizure disorder. (AR at 229.) Plaintiff denied delusions,
14 hallucinations, and suicidal ideation. (AR at 229.) Plaintiff was functioning well socially
15 and handled his financial affairs well. (AR at 229.) Mr. Friend opined that Plaintiff's seizure
16 activity "may negatively" affect "his ability to hold a job and makes driving impossibly
17 unsafe." (AR at 229.)

18                     **2. State Agency Examining Physician**

19      On December 23, 2004, Juli N. Sampat, M.D. examined Plaintiff at the request of the
20 state agency. (AR at 294-300.) Dr. Sampat assessed epileptic seizures by history. (AR at
21 297.) Plaintiff reported that Dilantin had not controlled the symptoms and had been
22 prescribed Depakote as well. (AR at 297.) Plaintiff reported that he had seizures once every
23 month or two months. (AR at 297.) Despite the fact that he was taken to the emergency
24 room, Plaintiff refused treatment twice. (AR at 297.) Dr. Sampat observed that when
25 questioned in detail about the history of seizures, Plaintiff was vague about symptoms such
26 as aura and loss of consciousness. (AR at 297.) Plaintiff had not had an MRI since he was
27 treated by Dr. Tritle, and his EEG remained normal. (AR at 297.) Plaintiff stated that his
28 last seizure occurred on December 12, 2004 and lasted for about two hours. (AR at 294.)

1  Dr. Sampat noted that Plaintiff seemed to be living an active lifestyle with an elderly
2  gentleman whom Plaintiff was helping to redo his home. (AR at 297.) Plaintiff stated that
3  he had not used illicit drugs for the past seven years and denied a history of chronic alcohol
4  abuse. (AR at 294.)

5  Dr. Sampat opined that Plaintiff would not be able to operate moving machinery or
6  climb to extreme heights, but could walk on level ground, use his hands and feet in a
7  repetitive fashion, see, hear, comprehend, converse, frequently climb a flight of steps, stoop,
8  kneel, crouch, crawl, and reach above his head without any difficulty. (AR at 297.) In the
9  medical source statement of ability to do work-related activities, Dr. Sampat opined that
10 Plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently; was not
11 limited in standing, walking, sitting, or alternating between standing and sitting; could climb,
12 balance, stoop, kneel, crouch, crawl, reach, handle, finger, feel, and grasp frequently; and
13 was restricted with respect to working around heights and moving machinery based on his
14 history of seizures. (AR at 298-300.)

### 3. State Agency Reviewing Physician

16 On January 13, 2005, James Hopkins, M.D. opined that Plaintiff could lift 25 pounds
17 frequently and 50 pounds occasionally; could sit, stand and walk for six hours out of an
18 eight-hour day; had no limitations in pushing or pulling; could frequently climb a ramp or
19 stairs, balance, stoop, kneel, crouch, and crawl; could never climb a ladder, rope, or scaffolds
20 due to seizure precautions; had no manipulative, visual, or communicative limitations; and
21 had to avoid workplace hazards such as machinery and heights due to seizure precautions.
22 (AR at 272-79.)

23 On December 13, 2004, James Campbell, M.D. opined that Plaintiff had only mild
24 functional limitations in activities of daily living, maintaining social functioning, and
25 maintaining concentration, persistence or pace, with no episodes of decompensation. (AR
26 at 290.) Dr. Campbell noted Plaintiff's diagnosis in July 2004 of adjustment disorder mixed
27 type primarily due to financial difficulties and continued physical problems. (AR at 292.)
28 Dr. Campbell opined that Plaintiff's mental condition is mild and would likely resolve with

improvement in his seizure disorder and that any limitations are physical in nature. (AR at 293.)

### B. Hearing Testimony

Plaintiff testified at the hearing on December 11, 2006 that he had graduated high school and lived with a friend. (AR at 530, 535.) Plaintiff did not have a driver's license or drive due to his seizures. (AR at 536.) Plaintiff stated that he did some work around the house, such as taking out the garbage, washing dishes, caring for pets, and shopping. (AR at 537.) Before May 2003, Plaintiff had worked in the home construction industry and doing conservation work. (AR at 538.) Plaintiff stated that he had not used alcohol at all in over a year. (AR at 543.)

Plaintiff testified that he had been having seizures for about five years, and that they had become more severe in the past two or three years. (AR at 530.) Plaintiff stated that he was currently having one to three seizures per week. (AR at 531.) Plaintiff testified that he feels weak and confused after a seizure episode for a couple of days, with concentration and memory problems. (AR at 532-33.) Plaintiff stated that he was being treated for depression and took medication to treat his depression. (AR at 532.) Plaintiff indicated that Depakote and Lamictal made him drowsy. (AR at 534.) Plaintiff stated that his seizures had stayed the same and that he had not had any periods of improvement. (AR at 534-35.)

Mark J. Kelman, a vocational expert ("VE"), also testified at the hearing. (AR at 540-45.) The VE testified that Plaintiff's past work in building trusses is medium semi-skilled work, that framing homes is heavy skilled work, that river restoration is heavy unskilled work, and that ranch hand work is heavy unskilled work. (AR at 541.) He also testified that Plaintiff's past work in lawn and garden maintenance is medium unskilled work. (AR at 541.) The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, and work experience who could perform work at the medium exertional level and is required to avoid workplace hazards. (AR at 541.) The VE testified that such individual could not perform any of Plaintiff's past work. (AR at 541.) The ALJ then asked the VE to also consider limitations concerning high production quotas and minimum contact with the

1  public. (AR at 542.) The VE testified that the individual would be able to perform medium
2  unskilled janitorial work and that there were 19,000 such positions statewide and one million
3  nationally. (AR at 542.) The VE also stated that the individual would be able to perform
4  medium food preparation and that there were 2,600 such jobs statewide and 127,000
5  nationally. (AR at 542.) The VE testified that if an individual were to miss four or more
6  days of work per month and could not complete assigned tasks in an eight hour day for four
7  or more days per month, no work would be available without a special accommodation. (AR
8  at 542.)

### C. ALJ's Decision

The ALJ concluded that Plaintiff was not under a "disability," as defined in the Act, at any time from the alleged onset date through the date of the decision, January 23, 2007. (AR at 12-19.) The ALJ found that Plaintiff had not engaged in any substantial gainful activity since May 2, 2003, the alleged onset date. (AR at 14.) The ALJ found that Plaintiff had the following severe impairments: affective disorder, history of seizures, and history of substance abuse disorder. (AR at 14-15.) The ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, with specific consideration given to sections 11.00, 12.04, and 12.09 of the Listings. (AR at 15.) The ALJ found that Plaintiff had the RFC to perform the exertional demands of medium work, but must avoid all workplace hazards. (AR at 16-17.) The ALJ also found that because of his affective disorder, Plaintiff can only perform low stress work with no high production quotas and requires minimal interaction with the public. (AR at 16-17.)

After considering the evidence of record, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent alleged. (AR at 16.) The ALJ concluded that Plaintiff was not capable of performing past relevant work in the construction or home building industry because of the requirement to avoid all workplace hazards. (AR at 17.)

1  Based on the testimony of the VE, the ALJ found that considering Plaintiff's age, education,
2  work experience, and RFC, he had been capable of making a successful adjustment to other
3  work that exists in significant numbers in the national economy. (AR at 18.)

4  **II.     LEGAL STANDARDS AND ANALYSIS**

5          The Social Security Act confines the scope of judicial review to evidence within the
6  administrative record. 42 U.S.C. § 405(g) (2006). The appropriate standard of review is
7  whether the ALJ's findings of fact are supported by substantial evidence and whether the
8  denial of benefits was free from legal error. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir.
9  1996) (citing *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989)). "Substantial evidence is
10 more than a mere scintilla, but less than a preponderance." *Aukland v. Massanari*, 257 F.3d
11 1033, 1035 (9th Cir. 2001) (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999)).
12 Substantial evidence means "such relevant evidence as a reasonable mind might accept as
13 adequate to support a conclusion." *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995)
14 (citing *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)). To determine whether an
15 administrative decision is supported by substantial evidence, the court must "review the
16 administrative record as a whole, weighing both the evidence that supports and [that which]
17 detracts from the ALJ's conclusion." *Magallanes*, 881 F.2d at 750. "The ALJ is responsible
18 for determining credibility and resolving conflicts in medical testimony." *Id*. (citing *Allen
19 v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)). If the evidence can support either affirming
20 or reversing the ALJ's decision, the court must uphold the decision. *Moncada*, 60 F.3d at
21 523 (citing *Magallanes*, 881 F.2d at 750). Reviewing courts cannot accept post hoc
22 rationalizations for agency action. *See, e.g.*, *NLRB v. Metro. Life Ins. Co.*, 380 U.S. 438, 444
23 (1965); *Pinto v. Massanari*, 249 F.3d 840, 847 (9th Cir. 2001). Thus, the decision must be
24 upheld, if at all, on the grounds articulated in the ALJ's opinion. *Pinto*, 249 F.3d at 847.
25         To qualify for disability benefits under the Act, a claimant must show that:
26         (a) the claimant suffers from a medically determinable physical or
   mental impairment that can be expected to result in death or that has
27 lasted or can be expected to last for a continuous period of not less
   than twelve months; and (b) the impairment renders the claimant
28 incapable of performing the work that the claimant previously

- 8 -

>performed and incapable of performing any other substantial gainful employment that exists in the national economy.

*Tackett*, 180 F.3d at 1098; 42 U.S.C. § 423(d)(1)(A), (d)(2)(A) (2004). The Social Security Regulations set forth a five-step sequential process for evaluating disability claims. *See* 20 C.F.R. § 404.1520 (2006). This scheme was summarized by the Ninth Circuit as follows:

>Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
>
>Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
>
>Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
>
>Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
>
>Step five: Does the claimant have the residual functioning capacity ["RFC"] to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1996).

An applicant's claim of disability can be rejected at any stage of the sequential process. *Id.*; 20 C.F.R. § 404.1520 (2006). The claimant bears the burden of proof at steps one through four of the sequential process. *Tackett*, 180 F.3d at 1098; *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998). At step five, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work that exists in the national economy. *Reddick*, 157 F.3d at 721.

Plaintiff argues that the ALJ erred in his step three analysis of whether Plaintiff's impairments meet or equal a listed impairment and improperly rejected the opinions of treating medical sources.

**A.   Step Three Analysis**

Plaintiff argues that the ALJ erred by failing to sufficiently articulate the reasoning on which he based his finding that Plaintiff's seizure disorder did not meet or medically equal

1 the impairment in section 11.00 of the Listings.[1] (Pl.'s Opening Br. at 5.) The ALJ stated
2 that he specifically considered section 11.00 of the Listings, which concerns neurological
3 disorders. (AR at 15.) Defendant argues that Plaintiff does not discuss the requirements of
4 section 11.00 of the Listings or explain how he meets all of the requirements of this section.
5 Defendant also argues that the ALJ need not specifically state what evidence supported his
6 conclusion that the claimant's impairments did not meet or equal the impairments in the
7 Listings where the ALJ's listing finding is supported by an "adequate statement of the
8 'foundations on which the ultimate factual conclusions are based.'" *Gonzalez v. Sullivan*,
9 914 F.2d 1197, 1201 (9th Cir. 1990) (quoting *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th
10 Cir. 1981)). In *Gonzalez*, the Ninth Circuit Court of Appeals made clear that it is
11 "unnecessary to require the Secretary, as a matter of law, to state why a claimant failed to
12 satisfy every different section of the listing of impairments." *Id*. The Ninth Circuit noted
13 that "[t]o require the ALJ's to improve their literary skills in this instance would unduly
14 burden the social security disability process." *Id*. (citing *Stephens v. Heckler*, 766 F.2d 284,
15 287 (7th Cir. 1985)). The ALJ's evaluation of the evidence in the sections of the decision
16 discussing the determination of Plaintiff's RFC, ability to perform his past work, and ability
17 to perform other work is an adequate statement of the foundations on which the ultimate
18 factual conclusions are based. *See id.*

19 The ALJ discussed the fact that Plaintiff alleged having one to three seizures per week
20 and experiencing weakness and confusion for several days, along with problems with

---

[1] Defendant argues that this argument is wholly deficient because Plaintiff has failed to properly articulate and support his argument and that it should be deemed waived. The Court agrees that Plaintiff failed to articulate an argument as to how the ALJ erred and failed to support his argument by proper citations. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (noting that "we review only issues which are argued specifically and distinctly") (internal quotations omitted)*; Graves v. Astrue*, No. 07-01258-GMS (D. Ariz. Sept. 5, 2008). However, the Court will consider the issue and, for the reasons discussed below, concludes that the ALJ properly found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

1  memory, concentration, and drowsiness from his seizure medication regimen. (AR at 16.)
2  The ALJ also explained why he found that Plaintiff's statements concerning the intensity,
3  persistence, and limiting effects of his symptoms were not credible to the extent alleged.
4  (AR at 16.) The ALJ noted that Plaintiff's statements regarding the frequency of his seizures
5  and his alcohol use are not consistent. (AR at 16.) The ALJ stated that although Plaintiff
6  testified to having one to three seizures per week and complained of two to three seizures per
7  week in May 2004, he told Dr. Sampat that his seizures were much less frequent (once every
8  month or two months). (AR at 16, 297, 366, 531.) The ALJ also cited evidence from
9  Plaintiff's primary caregiver and friend, Steve O'Bannon, who reported that Plaintiff had
10 seizures once or twice per week while on his "new" medication. (AR at 16, 179.) The ALJ
11 noted that one of Plaintiff's treating physicians, Dr. Shah, suspected Plaintiff of
12 pseudoseizures. (AR at 16.) The ALJ also cited numerous inconsistencies in Plaintiff's
13 statements concerning his alcohol use. (AR at 16, 220, 294, 327, 466, 488.) Although
14 Plaintiff testified on December 11, 2006 that he had not used alcohol at all in over a year, he
15 reported drinking two beers per night on April 3, 2006. (AR at 466, 543.) The ALJ provided
16 clear and convincing reasons for finding that Plaintiff's statements concerning the frequency
17 of his seizures and the intensity, persistence, and limiting effects of his symptoms were not
18 credible. (AR at 16-17.)

19      The ALJ also discussed the medical evidence concerning Plaintiff's seizure disorder
20 and its effect on his ability to work. (AR at 17.) As discussed in more detail below, the ALJ
21 explained his reasons for giving little weight to Mr. Friend's opinion that Plaintiff's seizure
22 disorder may negatively affect his ability to hold job. (AR at 17, 229.) The ALJ noted that
23 none of Plaintiff's treating physicians had provided a complete medical source statement of
24 his physical or mental RFC. (AR at 17.) The ALJ gave weight to the agency medical
25 consultants to the extent they were consistent with the medical evidence and findings. (AR
26 at 17.) Specifically, the ALJ found the medium RFC assessed by examining physician Dr.
27 Sampat to be highly probative because it was supported by the results of her examination,
28 the overall record, and the conclusions of the state agency medical consultant, Dr. Hopkins.

1 (AR at 17, 298-300.) The ALJ's evaluation of the evidence in the sections of the decision
2 discussing the determination of Plaintiff's RFC, ability to perform his past work, and ability
3 to perform other work is an adequate statement of the foundations on which the ultimate
4 factual conclusions are based. The ALJ also considered Plaintiff's seizure disorder in finding
5 that Plaintiff is limited to work that avoids all workplace hazards, is low stress, involves
6 minimal interaction with the public, and does not involve high production quotas. (AR at
7 16.) The ALJ properly found that Plaintiff did not have an impairment or combination of
8 impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part
9 404, Subpart P, Appendix 1.

### B. Treating Source Opinions

Plaintiff argues that the ALJ erred by improperly rejecting treating source opinions. "To reject an uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing *Lester*, 81 F.3d at 830-31). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* "This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citing *Magallanes*, 881 F.2d at 751).

Specifically, Plaintiff argues that the ALJ erred by implicitly rejecting the opinion of a treating physician by failing to cite a GAF score of 50 assessed by a psychiatrist. (Pl.'s Opening Br. at 6.) Plaintiff objects to the fact that the ALJ cited a GAF score of 68, noting that it indicates mild symptoms, while failing to cite the GAF score of 50, which indicates more serious symptoms. (Pl.'s Opening Br. at 6.) In fact, the ALJ explicitly rejected the finding in July 2004 that Plaintiff's GAF score was 50 without considering Plaintiff's drug

1 and alcohol addiction.[2] (AR at 17, 342.) The ALJ noted that there is very little in the record
2 to support this medical opinion, that Plaintiff did not originally allege any psychiatric
3 condition, and that his mental difficulties seem to be due more to his general physical
4 condition and possible abuse of alcohol. (AR at 17.) The two GAF scores are contradictory,
5 and the ALJ providing specific and legitimate reasons that are supported by substantial
6 evidence for rejecting the July 2004 finding.

7 Plaintiff also argues that the ALJ erred by giving little weight to the opinion of Mr.
8 Friend, Plaintiff's social worker and therapist. (Pl.'s Opening Br. at 7.) Mr. Friend opined
9 that Plaintiff's propensity for falling because of his seizure activity and post-seizure
10 confusion may negatively affect his ability to hold a job. (AR at 17, 229.) The ALJ noted
11 that Mr. Friend is not a medical doctor or a vocational expert, and therefore gave little weight
12 to his opinion. (AR at 17.) Plaintiff argues that Social Security Ruling 06-03p indicates that
13 a therapist is an "other" source that should be considered when appraising a claimant's
14 capacity. (Pl.'s Opening Br. at 7.) The ALJ did consider this "other" source, and properly
15 decided to give it less weight than the opinions from examining medical sources and the
16 vocational expert. (AR at 17.) The ALJ may "accord opinions from other sources less
17 weight than opinions from acceptable medical sources." *Gomez v. Chater*, 74 F.3d 967, 970-
18 71 (9th Cir. 1996); *see also* 20 C.F.R. § 404.1513(a) & (d). The ALJ may discount lay
19 witness testimony by providing reasons that "'are germane to each witness.'" *Greger v.*
20 *Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006) (quoting *Dodrill v. Shalala*, 12 F.3d 915, 919
21 (9th Cir. 1993)). The ALJ did give reasons that were germane to Mr. Friend for finding the
22 opinions of examining medical sources and the vocational expert more persuasive. (AR at
23 17-18.)

---

[2] 42 U.S.C. § 423(d)(2)(C) states: "An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."

- 13 -

Plaintiff also argues that Mr. Friend's opinion should be given the same weight as a psychiatrist because he is part of the "interdisciplinary team" treating Plaintiff. (Pl.'s Opening Br. at 7 (citing *Gomez*, 74 F.3d at 970-71).) In *Gomez*, a nurse practitioner's opinion was considered as part of a doctor's opinion where she worked closely under the supervision of the doctor, consulted with the doctor numerous times, and was acting as an agent of the doctor. 74 F.3d at 971. Here, Mr. Friend's opinion was included in a letter to the state agency. There is no evidence that Mr. Friend's opinion was contained in a report of an interdisciplinary team that contains the evaluation and signature of an acceptable medical source, nor is there evidence showing the kind of close supervision and consultation described in *Gomez*. Therefore, the ALJ properly considered Mr. Friend's opinion and accorded it less weight.

The Court has reviewed the administrative record as a whole, and concludes that the ALJ's findings of fact are supported by substantial evidence and that the denial of benefits is free from legal error.

**IT IS ORDERED** affirming the decision of the Commissioner of Social Security.

DATED this 10th day of March, 2009.

_____
Susan R. Bolton
United States District Judge